## FREDERICK BAKER *et al.*

*v.*

## MARY S. SCOTT.

1. SHELLY'S CASE—*rule in applies in Illinois.* The common law of England, so far as applicable and of a general nature having been adopted in this State at an early date and continued in force by statute, except so far as the same has been repealed, it follows that the rule in Shelly's case, which is a part of the common law, is in force in this State, it being in harmony with the genius of our institutions, and not in conflict with any statutory provision.

2. SAME—*what is the rule in.* At common law the rule in Shelly's case is not a rule of interpretation, but a rule of property, under and by which all devises of legal estates wherein lands are given to a person for life, or for any greater estate, with an immediate remainder to the "*heirs,*" or "*heirs of the*"

*body,*" of such devisee, the word heirs, or heirs of the body, will operate as words of limitation, and give the devisee an estate in fee simple or in fee tail.

3. SAME—*requisites of the rule.* The requisites of the rule in Shelly's case are, that there must, in the first instance, be an estate of freehold devised; there must be a limitation to the heirs, or heirs of the body of the person taking that estate, by that name, and not to the heirs as meaning or explained to be sons, children, etc.; the heirs must be named to take as a class or denomination of persons in succession from generation to generation, and by way of remainder, or at least, so that the estate to arise from the limitation to the heirs, and the estate of freehold in the ancestor, shall both owe their effect to the same deed, will, or writing; and that the several limitations shall give interests of the same quality, both legal or both equitable.

4. SAME—*limitation.* The rule does not apply when the words lawful issue, sons, or children, are used, instead of the word "*heirs,*" because those words are regarded as words of purchase, and not of limitation; and the ancestor, when such words are used, will take only a life estate, and his sons and children will take by purchase, or under the will, for the reason that they are a designation of persons to take originally in their own right. When taking in character of heir, he must take in quality of heir, that is by descent.

5. WILL—*devise—rule in Shelly's case applied.* A testator, by the terms of his will, devised to his daughter one-third of all his property left after the payment of debts, with the following limitation: "and it is my desire that my daughter, Mary Sophia, shall receive so much of her share of the rents and profits as shall be necessary for her education, until she is twenty-three years of age, after which she may come into possession of the full amount of rents and profits, the principal to descend to her heirs:" *Held,* that the rule in Shelly's case was applicable to such devise, and by it the daughter took an estate of inheritance in fee simple in one-third of the lands of the testator left after the payment of debts.

6. SAME—*rule not affected by a power of sale.* And the fact that a mere naked power was given to the executors to sell certain town lots upon a certain contingency, where no trust was created, was held not to affect the application of the rule.

7. CONTINUANCE. Where a complainant made a substantial amendment to her bill, the defendant moved for a continuance on that ground, which the court overruled: *Held,* on appeal, when it appeared that the cause was afterward continued by the expiration of the term, that the error did no injury, and furnished no ground of reversal.

8. PARTIES *in chancery—wife of mortgagor on foreclosure.* On bill to foreclose a mortgage executed by a husband alone to secure the payment of purchase money, his wife is neither a necessary nor proper party defendant.

9. FORECLOSURE—*decree for possession.* A decree for the foreclosure of a mortgage, among other things, provided that if the premises, in case of sale, were not redeemed in fifteen months, the master in chancery execute a deed to the holder of the certificate of purchase, and requiring the delivery of possession to the grantee in such deed : *Held,* no error.

10. SAME—*interest.* When a personal decree is rendered against a mortgagor for the balance of the debt remaining after the sale of the mortgaged premises, with interest, if the proceeds of sale shall not extinguish the interest accrued on the original debt, the court should see that interest is not allowed on interest.

APPEAL from the Circuit Court of Stephenson County; the Hon. WILLIAM BROWN, Judge, presiding.

Mr. J. A. CRAIN, for the appellants.

Mr. HENRY C. HYDE, for the appellee.

Mr. JUSTICE BREESE delivered the opinion of the Court:

The determination of this cause depends upon the effect of the terms used in the will of Orestes H. Wright, which are as follows :

" After all my honest debts are paid, it is my desire that what property is left should be shared equally between my dear and lovely wife, Mary M. Wright, and my dear children, each one-third; that my wife shall retain her third till her death, and then it shall descend to her natural children; and it is my wish that both of my children shall receive a good moral education, which shall be paid out of the rents or interest of property, or dividends of profits of railroad·stock, so that the principal shall not be diminished, as there will be amply sufficient. Should my son William be a steady, sober, and industrious young man, as I hope and pray he will be, it is my wish that he should have the rents and profits of his share of the estate after he is twenty-one years old, until he arrives at twenty-five years of age, and then to come into full possession of the principal, and not before ; but should he not be a temperate, sober man, it is my desire that it be so fixed, that he shall receive, year by year, the profits only, and that the principal descend to his heirs; and

it is my desire that my daughter, Mary Sophia, shall receive so much of her share of the rents and profits as shall be necessary for her education, until she is twenty-three years of age, after which she may come into possession of the full amount of rents and profits, the principal to descend to her heirs. It is my desire that my executors and the guardian should consult the best interest and welfare of my wife and children in the management of the estate, and use their best discretion."

Mary Sophia, the devisee named in the above clause, inter-married with John Scott, and they, on the 21st day of March, 1868, executed to Frederick Baker, one of the appellants, a deed, in consideration of the sum of eight hundred and seventy-five dollars, for one of the tracts of land of which her father, O. H. Wright, died seized, and which had been set off and allotted to her in certain partition proceedings instituted by her against the widow, Mrs. Wright, and her brother, William, she claiming the fee therein. To secure the payment of six hundred and seventy-five dollars, part of the purchase money, Baker executed his two notes, and a mortgage on the land.

The notes not being paid, Mary S. Scott filed her bill in chancery to foreclose the mortgage, and for a decree that the land be sold, and that Clarinda Baker may be barred of dower.

The defendant Frederick Baker, answered, admitting the execution and delivery of the notes and mortgage as set forth in the bill, and alleges that he purchased the land, the consideration money expressed in the deed being its full value, and paid in cash two hundred dollars, and received a conveyance in fee, with the usual covenants of warranty, from complainant and her husband, and then alleges, that complainant deriving her title to the land through the devise of her father, she took, by that devise, a life estate only in the land; and her conveyance to the defendant carried that estate only to him, and that he should be compelled to pay on the notes and mortgage the present value of the estate so vested in the complainant at the time of her conveyance, deducting therefrom the purchase money paid, and alleging that such present value, after such deduction,

left nothing due on the notes and mortgage. The defendant also filed a cross-bill, alleging in substance the same facts, and praying the cancellation of the notes and discharge of the mortgage.

In answer to the cross-bill, complainant admitted all the material allegations of the same, except that part of it which claimed for her a life estate by the will, she insisting that by the terms of the devise the fee was vested in her.

The court decided complainant had a fee simple in the land, under and by virtue of the devise, and decreed a sale of the premises to satisfy the notes and mortgage.

To reverse this decree the defendants appeal, and contend that, by the devise, a life estate only was vested in complainant. Appellee contends that the words used in the will fall within the rule in Shelly's case; and that is the question before us. Another point is made by appellants, and that is, if the devise is within the rule in Shelly's case, that rule is not in force in this State.

The first point to be settled is, what is the rule in Shelly's case?

That case arose in the twenty-third year of the reign of Elizabeth, about the year 1579, near three hundred years ago, and is reported in 1 Coke's Rep. side paging 93 b., wherein, among other rulings, it was held, where the ancestor takes an estate of freehold, and in the same gift or conveyance, an estate is limited either mediately or immediately to his heirs, either in fee or in tail, the heirs are words of limitation of the estate, and not words of purchase.

Preston, in his elaborate treatise on " Estates," devotes a chapter of near two hundred pages, to a critical and searching analysis of this rule, and says the rule may be thus expressed: First. When a person takes an estate of freehold, legally or equitably, under a deed, will, or other writing, and afterward, in the same deed, will, or writing, there is a limitation by way of remainder, with, or without the interposition of any other estate, of an interest of the same quality, as legal or equitable, to his heirs generally, or his heirs of his body,

by that name in deeds or writings of conveyance, and by that, or some such name in wills, and as a class or denomination of persons to take in succession from generation to generation, the limitation to the heirs will entitle the person or ancestor himself to the estate or interest imported by that limitation.

He expresses the rule secondly, thus: Whenever the ancestor takes an estate of freehold, or frank tenement, and an immediate remainder is thereon limited in the same conveyance to his heirs or heirs in tail, such remainder is immediately executed in possession, in the ancestor so taking the freehold, and, therefore, is not contingent or in abeyance.

A third, and still more accurate expression of the rule is, as we have stated it at the outset, taken from the ruling of the court, as found in the reported case.

The author further says, this rule has been expressed with greater precision by one of the very able counsel, Sergeant Glynn, in *Perrin* v. *Blake,* to be "in any instrument if a freehold be limited to the ancestor for life, and the inheritance to his heirs, either mediately or immediately, the first taker takes the whole estate; if it be limited to the heirs of his body he takes a fee tail; if to his heirs, a fee simple." 1 Preston on Estates, 263, 4, 5.

This rule is venerable for its antiquity, having received the sanction of the highest courts in England as far back as the 18 of Edward II., and is based on their authority, as found in the year books of that and subsequent reigns.

This we gather from the able argument of Mr. Justice Blackstone, in the opinion delivered by him in the Court of Exchequer, in the celebrated case of *Perrin et al.* v. *Blake,* first reported in 4 Burrow, 2579, but more fully in 3 Greenleaf Cruise on Real Property, 313.

That was a case arising under the will of William Williams, and the question arose upon a demurrer to a replication in an action of trespass. It was there held by three judges against one, that the legal operation of the word heirs, as a limitation, might be controlled by the manifest intent of the testator, and be construed into the description of a purchaser.

In the will in question was this clause, " It is my intent that none of my children shall sell his estate for longer than his life, and to that intent, he gives all his estate to his said son, John, and said infant for their lives, remainder to trustees to preserve contingent remainders, remainder to the heirs of the bodies of his said sons," etc.

Three of the judges held that " heirs " must be construed a word of description, and the heir would take the inheritance as a purchaser, and, therefore, John took only an estate for life.

On a writ of error to the Exchequer chamber the case was there elaborately argued, and six of the seven judges concurred in overruling the judgment of the King's Bench, giving full effect to the rule in Shelly's case.

It was on that occasion the able and elaborate argument of Mr. Justice Blackstone was delivered. The suit was pending more than thirty years, the judges giving their opinions *seriatim* on the 29th of January, 1772, more than one hundred years ago. This case was taken to the House of Lords by the defendant. While pending there it was compromised.

The leading question in the case, for no one disputed or doubted the rule in Shelly's case, was, " Whether a testator's manifest intent might control the legal operation of the word heirs as a limitation? "

Even Justice Blackstone, in delivering his opinion, said he agreed with the King's Bench that if the intent of the testator manifestly and certainly appeared by plain expression, or necessary implication from other parts of the will, that the heirs of the body of A should take by purchase, and not by descent, then a devise to A for life, and after his decease to the heirs of his body, not only might, but must, be construed an estate in strict settlement ; but he thought it did not manifestly and certainly appear from the mere intended restraint of the power of alienation in A, that the testator had meant that the heirs of A's body should take by purchase and not by de-

scent, or even that he knew the difference between the two methods of taking.

But it was held by seven judges of the Exchequer, Justice Blackstone concurring, against one, and has been uniformly so held since, that the rule in Shelly's case was not a rule of interpretation, but an inflexible rule of property; and that in all cases of devises of legal estates whenever lands are given to a person for life, or for any greater estate, with an immediate remainder to the heirs or heirs of the body of such devisee, the word "heirs," or the words "heirs of the body," shall operate as words of limitation, and give the devisee an estate in fee simple or in tail.

As we understand, one of the principal reasons for establishing this rule was to prevent the abeyance or suspension of the inheritance. The rule, therefore, is only applied to those limitations in which the word "heirs" is used, on account of the maxim that *nemo est hæres viventis.* But the rule does not apply when the words lawful issue, issue, sons, or children are used instead of heirs. These words are regarded as words of purchase, and not of limitation, and the ancestor, therefore, would take only a life estate, and his sons or children would take by purchase, for the reason that they are a designation of persons to take originally in their own right. But when the limitation is to the heirs, it is, in legal intendment, as a class or denomination of persons to take in succession from generation to generation. 1 Prest. on Estates 265.

As Lord Thurlow said, in *Brown vs. Morgan,* 1 Brown's Ch. R. 216, when the heir takes in the character of heir, he must take in quality of heir, and all heirs taking as heirs must take by descent. Since the solemn determination in *Perrin* v. *Blake,* in the Exchequer, the rule in question has been regarded as one of the most firmly established rules of property, and, strictly speaking, no instance can be adduced of a departure from it. 2 Jarman on Wills 243, side paging.

The requisites of the rule are, that there must, in the first instance, be an estate of freehold devised; there must be a limitation to the heirs or heirs of the body of the person

taking that estate, by that name, and not the heirs as meaning or explained to be "sons," children, etc.; that these heirs must be named to take as a class or denomination of persons in succession from generation to generation, and by way of remainder, or at least so that the estate to arise from the limitation to the heirs, and the estate of freehold in the ancestor shall both owe their effect to the same deed, will, or writing; and that the several limitations shall give interests of the same quality, both legal or both equitable. 1 Prest. on Estates, 266.

Testing the devise in this case by these requisites, no one will deny it fulfills them all.

A life estate is devised to Mary Sophia. That is an estate of freehold, though not of inheritance. 1 Wash. Real Property 88 ; 4 Kent's Com. 23, 24. " The principal to descend to her heirs "—they are named to take as a class or denomination of persons in succession from generation to generation, and by way of remainder, or so that the estate to arise from the limitation to the heirs and the estate of freehold in Mary Sophia, both owe their effect to the same will, and that the several limitations give interests of the same quality, and both of them legal, there is no dispute.

That this rule was part of the common law of England, and an established axiom in the law of real property in that realm for near five hundred years, is not, and can not be denied. 4 Kent's Com. 243.

That it is law here, what more authoritative can be found than the Act of our General Assembly ?

" The common law of England, so far as the same is applicable and of a general nature, and all statutes or acts of the British Parliament made in aid of and to supply the defects of the common law, prior to the fourth year of the reign of King James the first, excepting the second section of the sixth chapter of 43 Elizabeth ; the eighth chapter of 13 Elizabeth ; and ninth chapter of 37 Henry VIII., and which are of a general nature, and not local to that kingdom, shall be the rule of decision, and shall be considered as of full force until repealed by legislative authority."

This law was enacted in 1845, having been first substantially enacted in 1819, and re-enacted in 1829, and again re-enacted in 1833, in the revision of that year.

Here is an emphatic declaration of the people, speaking through their representatives in the General Assembly, that " the common law of England, so far as the same is applicable, shall be the rule of decision, and shall be considered of full force until repealed by legislative authority."

Counsel for appellants quote from *Boyer* v. *Sweet,* 3 Scam. 120, remarks made by the Court on the extent to which the common law was adopted in this State, to all which we yield our cordial assent; but the question there was not in relation to a rule of property, but a rule of evidence, which evidence was, by the common law, admissible as the best evidence of which the nature of the case was susceptible, rendering the remarks themselves, perhaps, unnecessary. Reference is also made to the case of *Penny* v. *Little et al.* Id. 301, where the force of the common law was barely alluded to in connection with a question of remedy on a claim for rent. Nothing said in either case disturbs the fact, that the common law of England, in all cases, when not repealed or altered by legislative authority, is in full force in this State.

The only question then must be, is this rule, which is admitted to be a rule of property of the common law, applicable to our condition, to the genius and spirit of our institutions, and to their purposes and objects?

It is said by some courts, and of great respectability, that the rule was established by the courts of England in subserviency to the feudal policy prevailing at the time, and to the interest of the lords, whose feudal rights of relief, wardship, marriage, etc., would attach upon an estate devolving by descent, but would not attach upon a transmission by purchase. *Turman* v. *White's heirs,* 14 B. Mon. 560, 570.

Mr. Justice Blackstone, in his opinion in *Perrin* v. *Blake,* says, that in no feudal writer did he ever find a single trace of just reason assigned. He was inclined to believe the rule was first established to prevent the inheritance from being in abey-

ance. He says, one principal foundation for it was to obviate the mischief of too frequently putting the inheritance in suspense or abeyance; and another foundation might be, and probably was, laid in a principle diametrically opposed to the genius of the feudal institutions, namely : a desire to facilitate the alienation of land, and to throw it into the track of commerce one generation sooner, by vesting the inheritance in the ancestor, than if he continued tenant for life, and the heir was declared a purchaser. In support of this view, he cited from the year books the first case in which, as he believed, the principle of the rule in Shelly's case was established. It was in 18 Edward II. He concluded that the rule was of the highest antiquity, not merely grounded upon any narrow feudal principle, but applied, in the very first instance of which we have any knowledge, to the liberal and conscientious purpose of facilitating the alienation of land, by charging it with the debt of the ancestor. 1 Fearne on Rem. 85, 86; 1 Hargrave's Law Tracts, 499, 500.

If the rule was entirely of feudal origin, it is not, on that account, less binding on courts of justice, nor its authority the least diminished for that reason.

The same learned judge said: "There is hardly an ancient rule of real property but what had in it more or less of a feudal tincture; but whatever their parentage, they are now adopted by the common law of England, incorporated into its body, and so interwoven into its policy, that no court of justice in the kingdom had either the power or, he trusted, inclination to disturb them."

It has become a rule of property, and is, we believe, in harmony with the genius of our institutions, and with the liberal and commercial spirit of the age, which alike abhor the locking up and rendering inalienable real estate, and has challenged and received the willing obedience and support of the most able minds of England and the United States. ·

How many estates may be depending in this State upon this rule, we can only conjecture, that there are very many there can be no doubt, which an arbitrary declaration by this court,

of the inapplicability of the rule to our institutions, would un-
settle and destroy.   The courts of every State of this great
union in which the common law has been adopted, have, with-
out exception, upheld this rule, and guided their decisions by
it.   In some of them it has been abolished by statute in regard
to wills; in others, both as to deeds and wills.   A list of them
will be found in 2 Washb. Real Prop. 563, top paging in note.
This State is not one of them.

It is however intimated by appellants, that the effect of sec-
tion 13 of the conveyance act, R. S. 1845, chap. 24, p. 105,
is to abolish this rule.   That section is as follows: " Every es-
tate in lands which shall be granted, conveyed, or devised to
one, although other words heretofore necessary to transfer an
estate of inheritance be not added, shall be deemed a fee sim-
ple estate of inheritance, if a less estate be not limited by ex-
press words, or do not appear to have been granted, conveyed,
or devised by construction or operation of law."

Before the passage of this act it was the law, that in a
grant or conveyance, or devise, the word " heirs," or an
equivalent word, was necessary to transmit the inheritance.
By the omission of such word a life estate only was created.
Now if such word be omitted the fee passes to the grantee
and is transmissible to his heirs, if a less estate is not limited
by express words, or do not appear to have been granted,
conveyed, or devised, by construction or operation of law.

In this case there is no less estate limited by express words
to Mary, nor does a less estate appear to have been granted
or devised by construction or operation of law, but the con-
trary, for by construction and operation of law a greater
estate is devised under the operation of the rule in Shelly's
case.   The devise to Mary is of one-third of his estate, with
no express words limiting it to an estate for life.   Then
comes the provision making it descendible to her heirs.   The
devise is a freehold estate for life, though not so created by
express words, and by construction of law, the remainder
vests in the owner of the life estate.

If this section be intelligible, it is authority as well for

7— 62D ILL.

the operation of the rule in Shelly's case as for its repeal. Had the legislature designed to abolish that rule they would have done so in express terms easily understood.

As by section 6 of the same chapter the rule does not operate upon estates tail, as it declares, contrary to the rule in Shelly's case, that the first devisee or grantee of an estate tail shall take only for life and the remainder to pass in fee to the person or persons to whom the estate tail would, by common law, next pass after the death of the first grantee or devisee, the inference is, no change was intended to be made in the rule where by the deed or will the remainder is limited in fee.

The rule in Shelly's case having been acknowledged as a rule of property by the common law, from the time of Edward II., now near five hundred years, and though admitted to interfere in many cases with the presumed, and in some others with the declared, intention of the parties to the instrument to which it is applied, yet so strong has been the devotion of the courts to the common law that no court has yet been found bold enough to refuse its application in every proper case. We confess we have not the courage to do it. We dare not enter that edifice, consecrated by ages, and with rude hand hew down any one of its pillars.

We deem it useless labor to refer to and comment on the many cases cited by counsel in their argument. It is sufficient to say no reference is made to any case where the rule has been denied application.

Counsel for appellants cites *Jones et al.* v. *Bramblet et al.,* 1 Scam. 276, as bearing on this question. A reference to the case shows that this question was not in it or alluded to in the most distant manner.

We are also reminded that this court in *Seeley* v. *Peters,* 5 Gilm. 130, held the common law requiring the owner of cattle, hogs, etc., to keep them upon his own land, has never been in force in this State.

That rule was adapted to a densely populated country like England, but not applicable to a sparsely settled country

possessed of boundless feeding grounds for cattle. The court, therefore, say that law was not applicable to such a state of things.

The same can not be said of this rule, as we have shown.

It is but just, however, in quoting what was said in *Perrin* v. *Blake*, to consider the views presented by Lord Mansfield, who concurred with the majority of the Court of King's Bench, and of Mr. Justice Yates, who dissented.

Mr. Justice Yates, who was in the minority, in his dissenting opinion allowed full scope to the intention to be collected from the whole scheme and design of the testator, but he insisted that intention must be manifestly clear and likewise consistent with every rule of law; and he said after you have fixed the intention it then becomes a question whether such intention can be executed consistently with the established rules of law, and if it can not he thought we had better adhere to the law and let a thousand testator's wills be overthrown.

He maintained that in every devise of a legal estate the construction should be agreeable to the legal rules of construction, and thought the rule laid down in Shelly's case was one of them. He argued, as wills were to be construed according to the intention of the testator, so far as it was consistent with the rules of law, it was necessary to the safety and certainty of rules of property not to allow a testator to do that which was illegal. These established rules of construction formed, he said, the barriers which kept off uncertainty and vexatious litigations of disputed titles; and this certainty, so desirable, could no longer exist, than whilst the courts adhered to established rules of construction.

He said, these technical expressions were the measures of property in legal devises, and the law having fixed a determinate meaning to them, will not permit their sense to be perverted, but directs the judges ever to adhere to them, without the smallest departure.

Lord Mansfield said the rule was clear law, but was not a general proposition subject to no control, as when a testator's

intention was manifest on the other side, and when the objections might be answered. He found no cases in Brooke or Fitzherbert where these matters had come in question, so that the judges were agreed that the intention was to govern, and that Shelly's case did not constitute a decisive, uncontrollable rule. He admitted there was a devise to John Williams for life, and in the same will a devise to the heirs of his body, and he agreed that this was within the rule in Shelly's case; but his opinion was, that the intention being clear beyond doubt to give an estate for life to John Williams, and an inheritance successively to be taken by the heirs of his body, and his intention being consistent with the rules of law, it should be complied with, in contradiction to the legal sense of the words used by the testator so unguardedly and ignorantly.

So Justice Blackstone, in addition to what we have already quoted from his able opinion in overruling this judgment of the King's Bench, admitted that the great and fundamental maxim upon which the construction of every devise must depend was that the intention of the testator should be fully and punctually observed so far as the same was consistent with the established rules of law, and no further. He says there are some rules which are not to be reckoned among the great fundamental principles of juridical policy, but are mere maxims of positive law deduced by legal reasoning from some or other of the great fundamental principles, such as that a devise to a man for life, with remainder to the heirs of his body, shall constitute an estate tail. The rule in Shelly's case is not to be reckoned among the great fundamental principles of juridical policy, which can not be exceeded or transgressed by any intention of the testator, but is of a more flexible nature, and admits of many exceptions; for if the intention of the testator be clearly and manifestly contrary to the legal import of the words which he has thus hastily and unadvisedly made use of, the technical rule of law shall give way to this plain intention of the testator. The question is not whether the testator intended that his son John should have a power of alienation, for he most clearly expressed that the son should not have

such a power; the question is not whether the testator intended his son should have only an estate for life, for he believed there never was an instance where an estate for life was expressly devised to the first taker that the devisor intended he should have any more. But if he afterward gives an estate to the heirs of the tenant for life, or to the heirs of his body, it is the consequence or operation of law that in this case supervenes his intention, and vests a remainder in the ancestors; and, therefore, it has frequently been adjudged that though an estate be devised to a man for his life, or for his life *et non aliter*, or with any other restrictive expressions, yet if there be afterward added apt and proper words to create an estate of inheritance in his heirs or the heirs of his body, the extensive force of the latter words should overbalance the strictness of the former, and make him tenant in tail or in fee. The true question of intent would turn not upon the quantity of estate intended to be given to John, the ancestor, but upon the nature of the estate intended to be given to the heirs of his body.

That the ancestor was intended to take an estate for life, was certain; that his heirs were intended to take after him, was equally certain; but how those heirs were intended to take, whether as descendants or purchasers, was the question. If the testator intended they should take as purchasers, then John, the ancestor, only remained tenant for life; if he meant they should take by descent, or had formed no intention about the matter, then, by operation and consequence of law, the inheritance first vested in the ancestor. The true question, therefore, was, whether the testator had or had not plainly declared his intent that the heirs of the body of John Williams should take an estate by purchase, entirely detached from and unconnected with the estate of their ancestor? Or, in other words, whether he meant to put an express negative on the general rule of law, which vests in the person of the ancestor, when tenant of the freehold, an estate that is given to the heirs of his body? It was not incumbent on the plaintiff to show, by any express evidence, that his ancestor meant to adhere to the rule of law, for that was always supposed till the contrary was clearly proved; but

it was incumbent on the defendant to show, by plain and manifest indications, that the testator intended to deviate from the general rule, for that was never supposed till made out—not by conjecture, but by strong and conclusive evidence.

Applying these principles to the devise in question, can there be any doubt that the testator intended to give to the heirs of Mary the fee, and as the descendants of his daughter and not as purchasers. We think there can be no doubt on this point, and the principles above cited apply with full force.

But upon a careful examination of the devise, taken in connection with our statute above cited (Sec. 13, Ch. 24), Mary took a fee in one undivided one-third of the real estate. The clause is: "After all my honest debts are paid, it is my desire that what property is left should be shared equally between my dear and lovely wife, Mary M. Wright, and my dear children—each one third."

Appellants contend that although this devise, standing by itself, would take the fee, yet a subsequent clause limits her to a life-estate. That clause is: "And it is my desire that my daughter, Mary Sophia, shall receive so much of her share of the rents and profits as shall be necessary for her education until she is twenty-three years of age, after which she may come into possession of the full amount of the rents and profits, the principal to descend to her heirs."

We have argued the case on the admission that the clauses taken together limited the estate of Mary to a life estate; but, as the remainder was devised to her heirs we have discussed the case as coming within the rule in Shelly's case, and we will pursue the argument no further.

Appellants contend that where the testator has created an executory trust the rule does not apply. This is admitted, and the authority for it is to be found in 4 Kent's Com. 218; 2 Washb. on Real Prop. 557, top paging. This is understood to be such executory trusts as arise under a marriage settlement; they will not be held to come within the rule when such is not the intention of the parties.

The executory trust assumed to be created by this will is found in this clause:

"Should the loose property and collection of my debts not be sufficient to pay all my debts, it is my desire that so many town lots be sold, on not more than one year's time, as will be sufficient to settle my debts. It is also my desire that the village lots may be sold from time to time, so as not to hinder the growth of the village, if my executors think it best for the estate; also, should they think best to sell any of the unimproved land, it is my desire that they should do so and invest the avails of the lots and land in the Galena & Chicago Union Railroad stock, if possible."

It is very apparent no trust whatever is here created. A mere naked power to sell is given to the executors, in a certain contingency.

There are some minor points made by appellants which do not touch the merits of the case, and in which we can perceive no error.

The first is, the court overruled the defendant's motion for a continuance, which he claimed as consequent upon a substantial amendment to the bill.

This can not now be complained of, as a continuance was had by the expiration of the term. Appellant thereby had all the benefit of his motion.

The second is, that the court erred in overruling the defendants' demurrer, as to the defendant, Clarinda Baker. As the mortgage was given for the purchase money, the wife of Frederick Baker, the grantee in the deed from Mary Scott and her husband, had no dower in the land, and she was not a necessary party to the bill. Making her a party, which appears to have been done out of abundant caution, was improper, and her demurrer should have been allowed and she dismissed from the cause. The record does not show she was formally dismissed, but no subsequent proceedings were had against her. The costs of this demurrer should not be taxed against appellants, but against appellee; and in this particular, the decree will be modified.

The fourth error assigned is in receiving depositions by the master in chancery of certain witnesses. No specific objections to the depositions are pointed out, and, for aught we know, the testimony contained in them was relevant and important.

Another error assigned is in awarding a writ of possession before the confirmation of the master's report. The clause of the decree in this respect is as follows: That upon the expiration of fifteen months after the day of sale, if the land so sold shall not have been redeemed as provided by law, upon the production to the then acting master in chancery of this county of the certificate of purchase aforesaid, by the purchaser or purchasers, their heirs or assigns, that said master make, execute, and deliver to such holder of said certificate a good and sufficient conveyance in fee simple of said premises, or such part thereof as may have been sold; that upon the execution of the conveyance aforesaid the grantee or grantees in such master's deed have possession of said premises and that any of the parties to this cause who shall be in possession of said premises or any part thereof, and any person who may have come into possession under them, or either of them, since the commencement of this suit, deliver possession and surrender said premises to the grantee or grantees aforesaid upon production of such deed of conveyance.

The form of this decree in this respect is common to all the courts of this state exercising chancery powers, so far as we are advised. In *Aldrich* v. *Sharp*, 3 Scam. 261, this court said: When the decree contains no order for the surrender of the possession to the purchaser, the court on motion will make such order; and upon notice thereof to the party in possession, and demand of possession, the court will order an injunction against the party to deliver possession, and on affidavit that the same has been served, and the refusal is persisted in, a writ of assistance will issue to the sheriff to put the purchaser in possession, on his motion and without notice.

In *Lawrence* v. *Lane*, 4. Gilm. 354, it was said, the common practice in the courts of chancery in this and many other of

the United States, upon the foreclosure of mortgages, is to decree a surrender of the possession and title papers by the mortgagor and those claiming under him.

It is only inferentially that we can understand the decree required a report of the sale to be made by the master, but if it was his duty so to report, we must presume the master performed it to the satisfaction of the court, and that objections to the report were then and there made, if any existed, to it. It is not a reasonable presumption the master would give a certificate of sale and a deed, had not the court approved his report.

It is also complained by appellants that this portion of the decree is erroneous: "And it is further ordered, adjudged, and decreed that if the moneys arising from such sale shall be insufficient to pay the amount so due, etc., with the interest, costs, and expenses of sale, said master shall specify the amount of such deficiency in his report of sale, and on the coming in and confirmation of the report, the defendant Frederick Baker, who is personally liable for the payment of the debt secured by said mortgage, pay to the complainant the amount of such deficiency with interest thereon from the date of said last mentioned report, and that said complainant have execution therefor."

This kind of decree is authorized by the act of February 16, 1865, Sess. Laws, 1865, p. 36, and the court in pronouncing it very reasonably presumed the premises, when sold, would fetch at least the interest which had accrued on the decree.

Should the master report they did not, on sale, fetch the interest, and application is made for an execution to collect the balance, the court in ordering an execution would order and direct that the interest should not be compounded.

It is barely possible a case may arise wherein, upon a sale, the property sold may not fetch the interest which has accrued upon the decree. In this case it is not shown or pretended that any injury has accrued to appellants by the decree as it stands, nor can we perceive that any wrong or injustice is to be the consequence.

With the modification made as to the costs of the demurrer of Clarinda Baker, and the order to the circuit court on directing an execution, if one be applied for, that compound interest shall not be computed, the decree is affirmed.

*Decree affirmed.*