## HARDAGE *v.* STROOPE.

Opinion delivered December 23, 1893.

1   *Common law—Rule in Shelley's Case.*

Under section 566 of Mansfield's Digest, adopting the common law of England so far as applicable, the rule in Shelley's Case is in force in this State, except in so far as it has been repealed by section 643, *ib.*, abolishing fees tail.

2.   *Real property—Construction of deed.*

A conveyance of land to a grantee "for and during her natural life, and then to the heirs of her body in fee simple, and if, at her death, there are no heirs of her body to take the said land, then in that case to be divided and distributed according to the laws for descent and distribution in this State," comes within

the rule in Shelley's Case, and vests an estate of inheritance in the grantee, so that she becomes seized of the land in fee simple.

Appeal from Clark Circuit Court in Chancery.

JOHN E. BRADLEY, Special Judge.

*U. M. & G. B. Rose* and *J. H. Crawford* for appellants.

1. Mrs. Carroll's children took a *vested* remainder in fee, and after their death the mother inherited from them the fee simple in the estate. Citing 1 Fearne Cont. Rem. 216 ; 2 *id.* 73 ; 2 Washb. Real Prop. 226, 233, 243, 240, 227, 230, 224, 225, 250 ; 4 Kent, Com. 203, 205, etc.; 23 Ark. 179 ; Tiedeman, Real Prop. secs. 402, 401, 398, etc.; 2 Cruise, Real Prop. ch. 1, secs. 9, 4, 58 ; 6 Wall, 458, 476 ; 19 *id.* 167, 176 ; 113 U. S. 340 ; 141 *id.* 313 ; 4 Pet. 90 ; 12 Ala. 141 ; 46 Am. Dec. 249 ; 4 Johns. 61 ; 10 Tex. 560 ; 23 Penn. St. 31 ; 19 N. E. Rep. 539 ; 12 S. W. Rep. 349.

2. The rule in Shelly's Case applies in this case ; the heirs would take by descent and not by purchase, and they would be bound by her conveyance. 4 Kent, Com. 209, 216 ; 2 Washb. Real Pr. 270, 273, 274, etc.; 4 Maule & Sel. 362 ; 64 Pa. St. 9 ; 70 *id.* 72.

*Murry & Kinsworthy* for appellee.

1. The children of Mrs. Carroll took only a contingent remainder, which never became vested, they dying before their mother. 4 Kent, Com. *202, 200, etc ; 23 Pa. St. 31 ; 44 Ark. 458 ; 49 *id.* 125 ; 14 So. E. Rep. 640 ; 44 Ch. Div. 154 ; 20 Atl. Rep. 1002 ; 85 N. Y. 177 ; 18 Atl. 826 ; 26 N. E. Rep. 897 ; 2 Washb. Real Prop. 250 ; 1 Dougl. 265 ; 21 Atl. Rep. 826 ; 53 Ark. 185.

2. The rule in Shelly's case, *as modified by our statute*, doubtless is in force, *in a proper case*; in this State (51 Ark. 71), but it has no application here. At

common law, Mrs. Carroll would take an *estate tail*, which, by the operation of the rule in Shelly's Case, would be raised to an estate in fee simple; but not so in Arkansas, for, by statute, the rule has been rendered inoperative. Mansf. Dig. sec. 643. See 4 Kent *226, 228, etc.; 10 L. R. A. 162; 107 Ill. 182-6; 9 L. R. A. 165; 25* N. E. Rep. 1013; 21 Atl. 826; 15 S. W. 623; 26 N. E. 895; 20 Atl. 645; *Ib.* 497; 17 Atl. 11; 21 *id.* 596. It is only in cases where the technical words "heirs," or "heirs of the body," are used that the rule in Shelley's Case ever applies; and if we adopt the theory of appellant, and eliminate from the deed the words "and then to the heirs of her body in fee simple," we have a conveyance which does not contain these technical words, and is not subject to the operation of the rule in Shelley's case. 20 Atl. 624; 100 N. C. 254.

BATTLE, J. J. L. Stroope and wife conveyed the land in controversy to Tennessee M. Carroll, "to have and to hold the said land unto the said Tennessee M. Carroll for and during her natural life, and then to the heirs of her body, in fee simple; and if, at her death, there are no heirs of her body to take the said land, then, in that case, to be divided and distributed according to the laws for descent and distribution in this State." After this, Mrs. Carroll conveyed it in trust to James M. Hardage to secure the payment of a debt. She had two children born to her after the conveyance by J. L. Stroope and wife, but they died in her life time. She died leaving no heirs of her body, but left her father, W. S. Stroope, surviving. After her death the land was sold under the deed of trust, and was purchased by Joseph A. Hardage. W. S. Stroope, the appellee, now claims it as the heir of Mrs. Carroll, and Joseph A. Hardage, the appellant, claims it under his purchase.

The rights of the parties depend on the legal effect of the following words contained in the deed to Mrs.

Carroll: "To have and to hold the said land unto the said Tennessee M. Carroll for and during her natural life, and then to the heirs of her body, in fee simple; and if, at her death, there are no heirs of her body to take the said land, then in that case to be divided and distributed according to the laws for descent and distribution in this State." Appellee contends that Mrs. Carroll only took a life estate in the land under this clause, and that he is entitled to the remainder, she having left no descendants. On the other hand, the appellant contends that the remainder in fee vested in the children, and, when they died, Mrs. Carroll inherited it, and the whole estate in the land became vested in her; and that, if this contention be not true, the deed to Mrs. Carroll comes within the rule in Shelley's Case, and vested in her the estate in fee simple; and that in either event he is entitled to the land.

It is obvious that the deed to Mrs. Carroll created in her no estate in tail. Her grantor reserved no estate or interest, nor granted any remainder, after a certain line of heirs shall become extinct, but conveyed the land to her to hold during her life, and then to the heirs of her body *in fee simple*. No remainder vested in her children. It was to be inherited by the heirs of her body, and they were her descendants who survived her and were capable of inheriting at the time of her death. They might have been grand-children. They were not the children, as they died in the lifetime of their mother.

The effect of the deed, as explained by the *habendum*, in the absence of the rule in Shelley's Case, was to convey the land to Mrs. Carroll for her life, and then to her lineal heirs, and in default thereof to her collateral heirs. As there can be collateral heirs only in the absence of the lineal, the deed conveyed the land to Mrs. Carroll, in legal phraseology, for her life, and after her death to her heirs.

Two questions now confront us: (1.) Does the rule in Shelley's Case obtain in this State? (2.) And, if so, does the deed in question fall within it?

(1.)  Is it in force in this State?

Section 566 of Mansfield's Digest provides: "The common law of England, so far as the same is applicable and of a general nature, and all statutes of the British parliament in aid of or to supply the defect of the common law made prior to the fourth year of James the First (that are applicable to our own form of government), of a general nature and not local to that kingdom, and not inconsistent with the constitution and laws of the United States or the constitution and laws of this State, shall be the rule of decision in this State unless altered or repealed by the general assembly of this State."

The rule in Shelley's Case, as stated by Mr. Preston, which Chancellor Kent says is full and accurate, is as follows: "When a person takes an estate of freehold, legally or equitably, under a deed, will, or other writing, and in the same instrument there is a limitation by way of remainder, either with or without the interposition of another estate, of an interest of the same legal or equitable quality, to his heirs, or heirs of his body, as a class of persons to take in succession, from generation to generation, the limitation to the heirs entitles the ancestor to the whole estate." 4 Kent, Com. *215. Its origin is enveloped in the mists of antiquity. It was laid down in Shelley's Case in the 23rd year of the reign of Queen Elizabeth, upon the authority of a number of cases in the year-books. Sir William Blackstone, in his opinion in *Perrin* v. *Blake*, 1 W. Bl. 672, cites a case in 18 Edw. II. as establishing the same rule. The earliest intelligible case on the subject, however, is that of the *Provost of Beverly*, 40 Ed. III,

1. Rule in Shelley's Case.

which arose in the reign of Edward III, and substantially declared the rule as laid down in Shelley's Case.

Various reasons have been assigned for the origin of the rule. Chancellor Kent, upon this subject, says : " The judges in *Perrin* v. *Blake* imputed the origin of it to principles and policy deduced from feudal tenure ; and that opinion has been generally followed in all the succeeding discussions. The feudal policy undoubtedly favored descents as much as possible. There were feudal burdens which attached to the heir when he took as heir by descent, from which he would have been exempted if he took the estate in the character of a purchaser. An estate of freehold in the ancestor attracted to him the estate imported by the limitation to his heirs ; and it was deemed a fraud upon the feudal fruits and incidents of wardship, marriage and relief to give the property to the ancestor for his life only, and yet extend the enjoyment of it to his heirs, so as to enable them to take as purchasers in the same manner and to the same extent precisely as if they took by hereditary succession. The policy of the law would not permit this, and it accordingly gave the whole estate to the ancestor, so as to make it descendible from him in the regular line of descent. Mr. Justice Blackstone, in his argument in the Exchequer Chamber in *Perrin* v. *Blake*, does not admit that the rule took its rise merely from feudal principles ; and he says he never met with a trace of any such suggestion in any feudal writer. He imputes its origin, growth and establishment to the aversion that the common law had to the inheritance being in abeyance ; and it was always deemed by the ancient law to be in abeyance during the pendency of a contingent remainder in fee, or in tail. Another foundation of the rule, as he observes, was the desire to facilitate the alienation of land, and to throw it into the track of commerce one generation sooner, by vesting the inheritance in the ances-

tor, and thereby giving him the power of disposition. Mr. Hargrave, in his *Observations concerning the Rule in Shelley's Case*, considers the principle of it to rest on very enlarged foundations; and, though one object of it might be to prevent frauds upon the feudal lord, another and a greater one was to preserve the marked distinctions between descent and purchase, and prevent title by descent from being stripped of its proper incidents, and disguised with the qualities and properties of a purchase. It would, by that invention, become a compound of descent and purchase—an amphibious species of inheritance, or a freehold with a perpetual succession to heirs without the other properties of inheritance. In *Doe* v. *Laming* (2 Burr. 1100), Lord Mansfield considered the maxim to have been originally introduced, not only to save to the lord the fruits of his tenure, but likewise for the sake of specialty creditors. Had the limitation been construed a contingent remainder, the ancestor might have destroyed it for his own benefit; and if he did not, the lord would have lost the fruits of his tenure, and the specialty creditors their debts."

But, whatever may have been the cause of its origin, its effect has been "to facilitate the alienation" of land "by vesting the inheritance in the ancestor, instead of allowing it to remain in abeyance until his decease." Its operation in this respect has commended it to the favorable consideration of the most learned and able men of Great Britain and the United States, and, doubtless, contributed to its preservation and continuance, and enabled it to survive the innovation of legislation and the changes and fluctuations of centuries. Based upon the broad principles of public policy and commercial convenience, which abhor locking up and rendering inalienable any class of property, it has ever been in harmony with the genius of the institutions of our country and with the liberal and commercial spirit of the age.

Hence, it has been recognized and enforced as a part of the common law of nearly every State where it has not been repealed by statute. *Starnes* v. *Hill*, 16 S. E. Rep. (N. C.) 1011 ; *Baker* v. *Scott*, 62 Ill. 86 ; *Hageman* v. *Hageman*, 129 Ill. 164 ; *Dœbler's Appeal*, 64 Pa. St. 9 ; *Kleppner* v. *Laverty*, 70 Pa. St. 72 ; *Polk* v. *Faris*, 9 Yerger, 209 ; *Crockett* v. *Robinson*, 46 N. H. 454 ; 4 Kent's Com. Marginal pages, 229–233 ; 2 Washburn on Real Property (5th ed.), pp. 655–657.

The rule has never been changed in this State, except in one respect—estates tail have been abolished. Section 643 of Mansfield's Digest provides that whenever any one would become seized at common law "in fee tail of any lands or tenements, by virtue of a devise, gift, grant or other conveyance, such person, instead of being or becoming seized thereof in fee tail, shall be adjudged to be and become seized thereof for his natural life only, and the remainder shall pass in fee simple absolute to the person to whom the estate tail would first pass according to the course of the common law by virtue of such devise, gift, grant or conveyance." To this extent it has been repealed. In other respects it remains in full force in this State ; and it was so held in *Patty* v. *Goolsby*, 51 Ark. 71.

(2.) Does this case come within the rule?

2. Construction of deed.

"Whenever there is a limitation to a man which, if it stood alone, would convey to him a particular estate of freehold, followed by a limitation to his heirs    *    *    * (or equivalent expressions), either immediately, or after the interposition of one or more particular estates, the apparent gift to the heirs," according to the rule in Shelley's Case, "is to be construed as a limitation of the estate of the ancestor, and not as a gift to his heirs." The theory was that, in cases which come within the rule, the heirs take by descent from the ancestor, and they cannot do so unless " the whole estate is united,

and vests as an executed estate of inheritance in the ancestor." This theory was based upon the fact that "the ancestor was the sole ascertained and original attracting object, the ground-work of the grantor's or testator's bounty," and upon the presumption, arising from the fact, that the grantor or testator, as the case may be, " meant the person who should take after the ancestor should be any person indiscriminately who should answer the description of heirs   *   *   of the ancestor, and be entitled only in respect of such description," and that the estate devised or conveyed should vest in them in that character only. " In order to effectuate this intent, and secure the succession to its intended objects," the rule rejects, as inconsistent and incompatible with this primary or paramount intent, " any other intent that the ancestor should take an estate for life only, and the heirs should take by purchase," and vests the estate of inheritance in the ancestor. This was considered necessary to accomplish the primary object of the grantor or ancestor. 2 Fearne on Remainders, pp. 216–220.

"Hargrave has justly observed," says Fearne on Remainders, "that the rule cannot be treated as a medium for discovering the testator's intention, but that the ordinary rules for the interpretation of deeds should be first resorted to; and that when it is once settled that the donor or testator has used words of inheritance, according to their legal import; has applied them intentionally to comprise the whole line of heirs to the tenant for life; has made him the terminus, by reference to whom the succession is to be regulated; then the rule applies. But the rule is a means for effectuating the testator's primary and paramount intention, when previously discovered by the ordinary rules of interpretation; a means of accomplishing that intention to comprise, by the use of the word heirs, the whole line of

heirs to the tenant for life, and to make him the terminus, by reference to whom the succession is to be regulated. And the way in which the rule operates, as a means of doing this, is by construing the word heirs as a word of limitation ; or, in other words, by construing the limitation to the heirs general or special, as if it were a limit-ation to the ancestor himself and his heirs general or special." 2 Fearne on Remainders, p. 221.

In *Dœbler's Appeal*, 64 Pa. St. 9, Judge Shars-wood, in discussing the rule in Shelley's Case, said : ''If the intention is ascertained that the heirs are to take *qua* heirs, they must take by descent, and the inheri-tance vest in the ancestor. The rule in Shelley's Case is never a means of discovering the intention. It is ap-plicable only after that has been discovered. It is then an unbending rule of law, originally springing from the principle of the feudal system, and though the original reason of it, the preservation of the rights of the lord to his relief, primer seisin, wardship and marriage, has passed away, it is still maintained as a part of the sys-tem of real property which is based on feudalism and as a rule of policy. It declares inexorably that where the ancestor takes a preceding freehold by the same in-strument, a remainder shall not be limited to the heirs, *qua* heirs, as purchasers. If given as an immediate re-mainder after the freehold, it shall vest as an executed estate of inheritance in the ancestor; if immediately after some other interposed estate, then it shall vest in him as a remainder. Wherever this is so, it is not pos-sible for the testator to prevent this legal consequence by any declaration, no matter how plain, of a contrary intention. That is a subordinate intent which is incon-sistent with, and must therefore be sacrificed to, the paramount one. Even if he expressly provides that the rule shall not apply—that the ancestor shall be tenant for life only and impeachable for waste—if he interpose

an estate in trustees to support contingent remainders—or, as in this will, declare in so many words that ' he shall in nowise sell or alienate, as it is intended that he shall have a life interest only,' it will be all ineffectual to prevent the operation of the rule.  No one can create what is in the intendment of the law an estate in fee, and deprive the tenant of those essential rights and privileges which the law annexes to it.  He cannot make a new estate unknown to the law."

" The policy of the rule," says Chancellor Kent, " was that no person should be permitted to raise in another an estate which was essentially an estate of inheritance, and at the same time make the heirs of that person purchasers."  4 Kent's Com. 216.

At common law the word " heirs " was necessary to convey a fee simple by deed.  No equivalent words would answer the purpose.  If the conveyance was not made to a man and his heirs, the grantee only took a life estate, notwithstanding the estate was limited by such phrases as " to A forever," or " to A and his successors," and the like.  An express direction that the grantee should have the fee simple in the land would not have supplied the place of the word " heirs."  But in this State the question as to what estate a deed to land conveys is determined by the intent of the parties, as ascertained from the contents of the deed and the power of the grantor to convey.  When construed in this manner, it is obvious that the intention of the deed in question was to convey the land in controversy to Mrs. Carroll for life, then to her lineal heirs, and, in default thereof, to her collateral heirs ; in other words, to Mrs. Carroll for life, and, after her decease, to her heirs.  The intention that the heirs were to take only in the capacity of heirs is manifest.  The deed comes within the rule in Shelley's Case.  The estate of inheritance vested in Mrs. Carroll,

and she became seized of the land in fee simple. 2 Washburn on Real Prop. (5th ed.) p. 653.

"As a consequence from the foregoing principles, whoever has a freehold which, by the terms of the limitation, is to go to his heirs, may alien the estate, subject only to such limitation as may.have been created between his freehold and the inheritance limited to his heirs." 2 Washburn on Real Prop. 651.

It follows, then, that Mrs. Carroll had the right to convey the fee in the land in trust to secure the payment of her debts ; and that a sale of such estate, under the deed and in conformity with law, was valid.

The decree of the court below is reversed, and the cause is remanded for proceedings consistent with this opinion.